UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| RANDALL M. KAUTZ, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:07CV1310 TIA |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM AND ORDER**

This matter is before the Court under 42 U.S.C. § 405(g) for judicial review of the denial of Plaintiff's application for Disability Insurance Benefits under Title II of the Social Security Act. The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

## **I. Procedural History**

On September 6, 2001, Plaintiff filed an application for a Disability Insurance Benefits (DIB),[1] alleging disability beginning December 31, 2000 due to heart problems and hip pain. (Tr. 80, 142-44) An Administrative Law Judge (ALJ) issued a favorable decision dated August 23, 2002, finding the evidence in the record sufficient to support a disability determination. (Tr. 80-83) In that decision, the ALJ recommended that a medical review be conducted within 6 months, as Plaintiff continued recovery and rehabilitation. (Tr. 81)

In February 2004, Disability Determinations issued a cessation notice indicating that Plaintiff's disability ceased as of February 15, 2004 and terminated Plaintiff's benefits effective April 15, 2004.

---

[1] Although the Defendant correctly states that the Plaintiff filed an application for Supplemental Security Income (SSI) benefits, that application is not the basis of Plaintiff's Complaint. (Tr. 832-34; Complaint, pp. 2-3)

(Tr. 88) Thereafter, Plaintiff filed a Request for Reconsideration, and a disability hearing officer held a hearing on June 15, 2004, concluding that Plaintiff's medical impairments had improved and that he was no longer disabled. (Tr. 99-125) Plaintiff then requested a hearing before an ALJ, which was held on October 3, 2005, with a supplemental hearing held on July 25, 2006. (Tr. 19, 52-73, 126) In a decision dated October 19, 2006, an ALJ found that Plaintiff's disability ceased on February 15, 2004 and that he was ineligible for disability payments. (Tr. 19-29) On May 17, 2007, the Appeals Council denied Plaintiff's request for review. (Tr. 8-10) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. Evidence Before the ALJ

On November 18, 2003, Plaintiff completed a Report of Continuing Disability Interview form. Plaintiff reported that he had difficulty walking short distances and that he had to change sitting/standing positions every 40 minutes. While he could sometimes lift 30 pounds, Plaintiff stated that he could not carry the weight. Plaintiff was able to take care of the yard with frequent breaks and do most of the cooking. However, he performed little cleaning. He reduced his fishing to once or twice a month and had a stationary vehicle hunting license because he could not walk through fields or over rugged terrain. Although Plaintiff mostly stayed home, he did attend family gatherings over the holidays and go fishing and hunting with friends. He rarely drove more than 15 minutes. With regard to his medications, Plaintiff reported no side effects. (Tr. 199-206)

An examiner also completed a portion of the form, noting that Plaintiff walked with a distinctive limp and stood to stretch 3 to 4 times during the 45 minute interview. Plaintiff was cooperative but not overly communicative. (Tr. 207)

Plaintiff completed a Pain Questionnaire on December 1, 2003. He described his pain as

sometimes throbbing but mostly aching. The pain was located in his hip and back and occurred almost daily. Standing too long, sitting too long, and trying to carry heavy items brought on the pain. In addition, bending squatting, and stooping caused pain. Plaintiff reported that he took Motrin and sat in a hot tub to relieve the pain. He no longer took prescription medications because he became addicted to the medications. Plaintiff stated that his situation had not changed and that he experienced good and bad days. (Tr. 209)

Plaintiff further reported that he used a shower chair because he was unable to bend to wash his legs and feet. He was able to vacuum and wash a small amount of dishes, and he took out the trash via a wagon. Plaintiff could do yard work only by taking breaks. Plaintiff did not shop, but he could cook a regular meal in the oven or microwave. He experienced leg spasms at night which kept him awake. Plaintiff could count change, and he had a valid driver's license. On an average day, Plaintiff got dressed, ate, walked around the yard, and watched television. Plaintiff also indicated in the report that his wife completed the form because he could not read or write very well. (Tr. 210-14)

At the first hearing before the ALJ on October 3, 2005, Plaintiff was represented by counsel. (Tr. 19) Although the Respondent did not include that transcript in the record, Plaintiff's counsel stipulates that the ALJ's summary of Plaintiff's testimony contained in the October 19, 2006 decision is consistent with Plaintiff's prior counsel's hearing notes. Thus, Plaintiff adopts the ALJ's summary of the October 3, 2005 testimony. (Brief in Support of the Complaint, p. 12)

During the October 3, 2005 hearing, Plaintiff testified that he continued to experience pain in his left hip. He also incurred severe pain in his left shoulder, which required arthroscopic surgery in April 2005 and would require replacement surgery later in October 2005. Plaintiff continued to

3

take medication for hypertension and tachycardia. He testified that he could not stand or sit for more than 15 minutes at a time and that he used a cane a few times a week for walking when his leg hurt. Plaintiff further testified that he could lift about a gallon of milk in each hand. Plaintiff could also drive short distances, perform some cooking, and mow the lawn with a riding mower. However, he had not hunted, fished, or gardened for more than 2 years. Plaintiff stated that pain interrupted his sleep and that he did not have much energy. (Tr. 21)

On April 14, 2006, the ALJ submitted interrogatories to J. Stephen Dolan, the vocational expert (VE) who was present at the prior hearing. The ALJ asked the VE to assume that the claimant was a 45-year-old, right handed male with a 7th grade education. In addition, the hypothetical claimant was limited to lifting 20 pounds occasionally and 10 pounds frequently. He could stand and/or walk between two and five hours in an eight-hour workday, and he could sit for about six hours in an eight-hour workday. While he could occasionally climb ramps/stairs, kneel, and balance, the claimant need to avoid stooping, crouching, and crawling. Further, the claimant was limited to occasional pushing and pulling with the left upper and lower extremity, and the claimant could not work above shoulder level with the left upper extremity. The hypothetical claimant was limited to occasional use of the left upper extremity for handling and limited to frequent use of the left upper extremity for fingering. Finally, the claimant could perform only simple and/or repetitive work. The VE stated that Plaintiff was unable to perform any of his past relevant jobs, which required medium to very heavy, unskilled and semi-skilled, work. However, the VE reported that Plaintiff could perform jobs such as a cashier, outside deliverer, and security guard. (Tr. 242-47)

At the supplemental hearing held on July 25, 2006, Plaintiff was again represented by counsel. A Vocational Expert (VE), J. Stephen Dolan, testified regarding previous responses to

4

interrogatories. During the hearing, Plaintiff's attorney made some adjustments to the ALJ's hypothetical. When asked to assume that the hypothetical claimant was functionally illiterate, the VE responded that unarmed, unskilled security guards only needed to read simple warning signs and instructions. However, if the hypothetical individual had a 10 percent loss of pace due to the necessity of taking small breaks for pain, employers would likely terminate such individual. Further, if the person was illiterate, no jobs would be available. (Tr. 64-69)

### III. Medical Evidence

Plaintiff was diagnosed with Legg-Perthes disease[2] as a child, which developed into degenerative arthritis, osteoporosis, and avascular necrosis in the hip. Plaintiff underwent total hip replacement surgery in 2001 and a follow-up surgery in 2002. (Tr. 321-22, 326-30, 346) Plaintiff was also diagnosed with supraventricular tachycardia ("SVT"), heart palpitations, and hypertension. His condition was well-controlled with medications. (Tr. 255-297, 349-52)

On February 18, 2003, Dr. Fallon H. Maylack diagnosed mechanical low back pain. The examination also revealed good motion of the hips. Dr. Maylack recommended a lumbosacral brace, and he injected the tender area in Plaintiff's back with Carbocaine and Kenalog. (Tr. 484)

On August 28, 2003, Plaintiff was admitted to the ER with complaints of abdominal pain. Dr. David L. Shaw assessed acute abdominal pain and pancreatitis. A sonogram performed the following day revealed diffuse hepatocellular disease, distended gallbladder, and renal cyst. At the time of discharge on September 2, 2003, Dr. Shaw diagnosed alcoholic pancreatits and abnormal liver function tests. Dr. Shaw noted that Plaintiff needed to avoid all alcohol Tylenol. Plaintiff refused to

---

[2] Legg-Perthes disease is defined as "epiphysial osteonecrosis of the upper end of the femur." Stedman's Medical Dictionary 559 (28th ed. 2006).

5

enter an alcohol treatment center. (Tr. 487-504)

Plaintiff returned to Dr. Maylack on March 15, 2004, complaining of right hip pain and index finger pain. Plaintiff reported that he did a lot of hammering in his workshop. Dr. Maylack gave Plaintiff an injection of Carbocaine and Kenalog in the MCP joint of Plaintiff's right index finger and advised him to follow-up as needed. (Tr. 485)

On May 10, 2004, Dr. Bruce Donnelly completed a Physical Residual Functional Capacity Assessment as a non-examining physician. Dr. Donnelly opined that Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds. In addition, Plaintiff could stand, walk, and sit for about 6 hours during an 8-hour workday. He had unlimited ability to push and/or pull. In support of his opinion, Dr. Donnelly noted that Plaintiff's left hip remained stable and that Plaintiff did not have additional functional loss from pancreatitis. Dr. Donnelly further opined that Plaintiff could only occasionally climb, balance, stoop, kneel, crouch, and crawl due to restrictions secondary to history of hip replacement and ongoing AVN of the right hip. Dr. Donnelly noted that Plaintiff's allegations regarding his symptoms were fully credible. (Tr. 512-19)

Plaintiff was again admitted to the hospital on May 31, 2004 for complaints of abdominal pain. Dr. Shaw assessed acute pancreatitis. Dr. Landau, a consulting physician, noted that Plaintiff had been told that his pancreatitis was due to alcohol use; however, Plaintiff continued to drink a case of beer per week. Upon discharge on June 3, 2004, Dr. Shaw diagnosed alcoholic pancreatitis, abdominal pain, and abnormal liver functions. Secondary diagnoses included hypertension and supraventricular tachycardia. Although Dr. Shaw counseled Plaintiff regarding alcohol cessation, he did not have a good indication that Plaintiff planned to quit drinking. Dr. Shaw also advised Plaintiff to quit smoking. Dr. Shaw noted that Plaintiff's pain had improved and placed no restrictions on

6

Plaintiff's activity. (Tr. 561-74)

Dr. Maylack drafted a letter on June 15, 2004, indicating that Plaintiff should not participate in any high impact activities or occupations with repetitive lifting, climbing, standing, or squatting. (Tr. 535)

On October 17, 2004, Plaintiff returned to the ER with complaints of another pancreatic attack. Plaintiff also tested positive for Marijuana. Dr. Michael Brenner assessed pancreatitis and likely alcoholic hepatitis. Dr. Brenner recommended drinking no alcohol; resting until Plaintiff felt better; eating small and frequent meals; following a high protein, high carbohydrate, low fat diet; and taking medication as prescribed. Dr. Brenner also opined that Plaintiff's pain could be a result of Plaitniff's elevated liver tests. (Tr. 757-75)

On December 21, 2004, Plaintiff complained of pain in his right index finger. He denied a new injury but indicated that he used his hand a lot. Dr. Maylack performed an injection in the right index MP joint. (Tr. 536) Plaintiff returned to Dr. Maylack on March 1, 2005, complaining of discomfort with any motion of the left shoulder. Physical examination showed marked pain and decreased range of motion of the left shoulder. X-rays indicated avascular necrosis. Dr. Maylack recommended that Plaintiff undergo an MRI. During the follow-up examination on March 8, 2005, Dr. Maylack noted that the MRI revealed avascular necrosis of the humeral head. Dr. Maylack recommended nonsurgical management and gave Plaintiff an injection in the subacromial space of the left shoulder. (Tr. 537)

Plaintiff underwent arthroscopic surgery of the left shoulder on April 7, 2005. He returned to Dr. Maylack on April 19, 2005, who noted good wound healing but poor early range of motion. Plaintiff declined formal physical therapy and indicated that he would start therapy on his own and

7

continue working. On May 10, 2005, Dr. Maylack noted that Plaintiff's shoulder continued to improve and do well. Dr. Maylack recommended that Plaintiff continue with an exercise program and allowed Plaintiff to return to full activities. Dr. Maylack also gave Plaintiff an injection in the MCP joint of the right long finger. (Tr. 538-39) On October 5, 2005, Dr. Maylack performed another injection in Plaintiff's right middle finger. Dr. Maylack also noted that Plaintiff was scheduled for left shoulder replacement surgery, which he performed on October 18, 2005. (Tr. 595, 633-743)

On February 15, 2006, Jack C. Tippett, M.D., performed a consultative orthopedic evaluation of Plaintiff. Dr. Tippett noted that Plaintiff's chief complaints were pain in his left hip and pain and stiffness in his left shoulder. Dr. Tippett assessed status 1 ½ years following revision of left total hip replacement with a history of some remaining instability and status 4 or 5 months following left total shoulder replacement with moderate stiffness and persisting pain associated with atrophy of the shoulder musculature on the left side. (Tr. 745-46)

Dr. Tippett also completed a Medical Source Statement of Ability to do Work-Related Activities. He opined that Plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently. In addition, Plaintiff could stand and/or walk at least 2 hours in an 8-hour workday. He could sit for about 6 hours in an 8-hour workday. Dr. Tippett further opined that Plaintiff's impairments limited his ability to push and/or pull. Postural limitations included only occasionally climbing, balancing, and kneeling. Furthermore, Plaintiff could never crouch, crawl, or stoop. Plaintiff possessed manipulative limitations to reaching, handling, and fingering. Specifically, Dr. Tippett opined that Plaintiff could constantly reach, frequently handle, and occasionally finger. (Tr. 749-51)

Plaintiff returned to the ER for severe abdominal pain and nausea on March 16, 2006. Plaintiff reported worsening depression and heavier drinking. Initial blood work indicated alcoholic

pancreatitis and hepatitis. A mental status examination revealed alcohol abuse and dependence, as well as secondary depression, with a GAF of 40. Seth A. Tilzer, M.D., noted that Plaintiff was a candidate for intensive treatment on a partial hospitalization basis after completion of detox and medical stabilization. In a Consultation Report, Dr. Heather White noted that Plaintiff had been depressed and had done some binge drinking. Dr. White assessed abdominal pain, pancreatitis, alcoholic hepatitis, alcoholism, depression, and left shoulder problems. She noted that Plaintiff was depressed over his general state and that his functional status was not good. Dr. Shaw discharged Plaintiff on March 20, 2006 with principal diagnoses of alcoholic pancreatitis, alcoholic hepatitis, alcohol abuse, and depression and secondary diagnoses of hypertension, supraventricular tachycardia, and severe osteoarthritis, status post left hip and shoulder replacements. Dr. Shaw also instructed Plaintiff to take medication as prescribed, perform activity as tolerated, and follow a low fat, no alcohol diet. (Tr. 778-805)

In a letter dated April 12, 2006, Dr. Shaw noted that he was treating Plaintiff for severe osteoarthritis status post left shoulder and hip replacement, chronic pancreatitis, and depression. He opined that Plaintiff was disabled. (Tr. 754)

On April 26, 2006, Plaintiff returned to Dr. Maylack with complaints of some pain and stiffness in his shoulder. Dr. Maylack advised Plaintiff to continue with his home exercise program and activities as tolerated. On May 11, 2006, Dr. Maylack performed a closed manipulation of Plaintiff's left shoulder. Plaintiff's shoulder was doing great on June 27, 2006. However, Plaintiff reported problems with bending and straightening his left knee. Dr. Maylack assessed a soft tissue injury to the left knee and recommended an MRI, which revealed osteochondritis, but intact meniscus and ligaments. Dr. Maylack recommended nonsurgical management, including a brace for support

9

and an exercise program. (Tr. 807-812)

Dr. Shaw submitted a Physical Medical Source Statement on August 14, 2006. Plaintiff's diagnosis was chronic pancreatitis and left hip and shoulder replacement. Dr. Shaw opined that Plaintiff could sit, stand, and walk for 15 minutes during an 8 hour workday. Plaintiff could never lift or carry any weight. Further, Plaintiff had significant manipulative limitations to his ability to handle and work with small objects with his right hand. Plaintiff had no visual, communication, or hearing limitations. Dr. Shaw further opined that Plaintiff's ability to balance was limited, even when standing or walking on level terrain. Plaintiff could never reach above head or stoop. He could occasionally tolerate exposure to odors, dust, and noise. Plaintiff's medically determinable impairment of left shoulder and hip problems could be expected to produce constant pain all day. Objective indications of this pain included reduced range of motion. Subjective indications included complaints of pain, sleeplessness, and irritability. Additionally, Plaintiff displayed marked restrictions of daily activities and marked difficulty in maintaining social functioning. He also showed marked difficulties of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner due to pain. Dr. Shaw opined that Plaintiff did not require a cane or other assistive device. However, Plaintiff needed to lie down or take a nap during a normal 8-hour workday, as well as take more than 3 breaks. Dr. Shaw opined that Plaintiff would need to take 5 to 10 breaks in an 8-hour workday because of pain. According to Dr. Shaw, Plaintiff's limitations existed at the assessed severity as early as January 10, 2001. (Tr. 813-16)

## IV. The ALJ's Determination

In a decision dated October 19, 2006, the ALJ noted that Plaintiff was previously found disabled beginning December 31, 2000 on the basis of avascular necrosis and status-post two total

10

left hip replacement surgeries, with non-severe and controllable hypertension and supraventricular tachycardia. The ALJ further found that Plaintiff had not engaged in substantial gainful employment since December 31, 2000, despite some reported earnings for 2001. The medical evidence established that, since February 15, 2004, Plaintiff has had stable status-post left hip replacement, stable hypertension and tachycardia, status-post left shoulder replacement with onset of symptoms in March 2005, status-post anal fissure repair in September 2004, pancreatitis and alcoholic liver disease and mild hepatitis, and mild depression beginning March 2006. However, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or equaled any impairment listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 27-28)

Furthermore, the ALJ determined that the Plaintiff's and his wife's allegations regarding the severity of his impairments were not credible. The ALJ found that, since February 15, 2004, Plaintiff had the residual functional capacity ("RFC") to lift and carry 10 pounds frequently and 20 pounds occasionally; stand and walk 2 hours and sit 6 hours during an 8-hour workday; and do occasional climbing of ramps and stairs, kneeling, balancing, and pushing/pulling with the left upper and lower extremities. Plaintiff should not stoop, crawl, or crouch, other than to sit. Further, he should not work above shoulder level with the left upper extremity or use his left upper extremity more than occasionally for gross or fine manipulation. Further, Plaintiff was limited to simple, repetitive tasks. The ALJ noted improvement in Plaintiff's medical impairments since August 23, 2002, which was related to his ability to work. (Tr. 28)

The ALJ determined that, although Plaintiff was unable to perform any past relevant work, he had the RFC for a wide range of light-sedentary work, reduced by the limitations set forth above. Plaintiff was defined as a younger individual with a 7th grade limited education. However, Plaintiff

was literate and able to communicate in English. He had no acquired or usable skills transferable to the skilled or semi-skilled functions of other work. Based upon these factors, the ALJ found that Plaintiff could perform work at the light and sedentary levels. Because Plaintiff's limitations prevented him from performing the full range of light-sedentary work, the ALJ used the Medical-Vocational Guidelines ("Grids") as a framework and relied on the VE's opinion to find that a significant number of jobs existed in the national and local economies that Plaintiff could perform. Such jobs included cashier, outside deliverer, or security guard. Thus, the ALJ determined that Plaintiff's disability ceased on February 15, 2004. The ALJ further noted that Plaintiff had no substance use disorder that was uncontrollable or prevented him from performing substantial gainful activity. Alternatively, if Plaintiff were disabled due to chronic and uncontrolled alcohol use, he would not be disabled if he stopped using alcohol. Thus, the ALJ concluded that Plaintiff was ineligible for disability payments and that his previous entitlement to disability insurance benefits ended effective April 15, 2004. (Tr. 28-29)

## V. Legal Standards

20 C.F.R. § 404.1594(a) provides that continued entitlement to disability benefits must be reviewed periodically, and the Commissioner must determine whether any medical improvement in the claimant's impairments exists and, if so, whether the improvement is related to the claimant's ability to work. 20 C.F.R. § 404.1594(a); Mittlestedt v. Apfel, 204 F.3d 847, 852 (8th Cir. 2000). "When benefits have been denied based on a determination that a claimant's disability has ceased, the issue is whether the claimant's medical impairments have improved to the point where he is able to perform substantial gainful activity." Delph v. Astrue, 538 F.3d 940, 945 (8th Cir. 2008). To determine "medical improvement," the Commissioner compares a claimant's current condition with

12

his condition at the time claimant was found disabled and awarded benefits. Id.

The regulations provide a sequential process involving up to eight steps in determining whether a claimant's disability has ceased. Id. Under 20 C.F.R. § 404.1594(f), the Commissioner must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant as an impairment or combination of impairments which meets or equals the severity of an impairment listed in 20 C.F.R., Subpart P, Appendix ; (3) If the impairment does not meet a listing, whether there has been medical improvement; (4) if there has been medical improvement, whether the improvement relates to the claimant's ability to do work; (5) if no medical improvement exists or the improvement is unrelated to the claimant's ability to work, whether an exception to medical improvement applies; (6) if medical improvement does exist and is related to the claimant's ability to work, whether all of the claimant's combined current impairments are severe; (7) if the current impairment or combination is severe, whether the claimant has the residual functional capacity to perform any past relevant work; and (8) if the claimant cannot perform his past relevant work, whether the claimant can perform other work. See also Delph v. Astrue, 538 F.3d 940, 945 (8th Cir. 2008); Dixon v. Barnhart, 324 F.3d 997, 1000-1001 (8th Cir. 2003).

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F. 3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record de novo. Id. at 1328 (citing Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial

evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-586 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that he or she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[3] standards and whether the evidence so contradicts plaintiff's subjective

---

[3]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

14

complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak, 49 F.3d at 1354.

## VI. Discussion

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the ALJ failed to fully develop the record by not ordering a psychological evaluation. Plaintiff also contends that the ALJ failed to properly determine Plaintiff's residual functional capacity ("RFC") based on properly weighed medical evidence. The Defendant responds that the ALJ was not obligated to order psychological testing, where Plaintiff did not allege that he had mental health issues or intellectual impairments. Further, Defendant asserts that the ALJ properly weighed the opinion of Plaintiff's treating physician because the record did not support that opinion.

The undersigned finds that substantial evidence supports the ALJ's determination. Although the ALJ has a duty to fully and fairly develop the record, the ALJ is required to do so only where the medical evidence is insufficient to determine whether the Plaintiff is disabled. Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994). Here, although Plaintiff was diagnosed with depression, the physicians noted that the depression was related to his alcohol abuse. (Tr. 779, 784, 787) Plaintiff was prescribed anti-depressants and advised to attend outpatient counseling with a psychiatrist. Nothing in the record indicates that Plaintiff followed through with this advice. Further, Plaintiff did not allege depression as a disability in his application or in subsequent questionnaires. (Tr. 209-14) During the hearings, Plaintiff did not allege that he suffered from depression, and his attorney did not mention depression in the hypothetical question posed to the VE. This scant evidence is insufficient

15

to require the ALJ to order a psychological evaluation for depression. See Hensley v. Barnhart, 352 F.3d 353, 357 (8th Cir. 2003) (because plaintiff did not allege disability based on depression; did not seek professional mental health treatment; and was only prescribed antidepressants, the ALJ was not required to inquire further into plaintiff's condition by ordering a psychological examination). Therefore, the ALJ properly evaluated Plaintiff's alleged mental impairment and did not need to order further psychological testing.

Plaintiff also asserts, however, that the ALJ should have ordered psychological testing based on Plaintiff's alleged illiteracy. Again, the undersigned finds that further testing was not warranted. Although Plaintiff indicated that he did not read or write well, none of the examining physicians indicated that Plaintiff was impaired due to an inability to read or write. According to Dr. Shaw's Physical Medical Source Statement, Plaintiff did not have a limitation which would prevent the ability to hear and understand simple oral instructions or communicate simple information. (Tr. 814) Dr. Tilzer, a psychiatrist, determined that Plaintiff possessed an average intellect. (Tr. 784) Further, Plaintiff did not allege in questionnaires or during the hearing that he was unable to read or write, only that he did not perform these tasks well. Plaintiff was able to count money, and he was literate enough to obtain a driver's license. Indeed, Plaintiff is unable to point to any evidence in the record which would support his allegation that he is illiterate.

Even though an ALJ must fairly and fully develop the record, the ALJ is not obligated to investigate a claim that the Plaintiff did not present in his application for benefits or offer at the hearing as a basis for disability. Mouser v. Astrue, 545 F.3d 634, 639 (8th Cir. 2008) (citations omitted). Here, the record lacks sufficient evidence that would require the ALJ to conduct further inquiry into Plaintiff's mental capacity. Although Plaintiff mentioned some trouble reading and

16

writing, he was able to work for many years despite his alleged illiteracy, which undermines Plaintiff's claim that his mental impairments prevented him from working. Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000). Thus, the undersigned finds that the ALJ was not obligated to order psychological testing regarding Plaintiff's level of literacy. See Mouser, 545 F.3d at 639 (finding that the ALJ fully and fairly developed the record despite the plaintiff's enrollment in special education classes where the plaintiff held semi-skilled jobs for many years; got along well with people; and could count money, follow directions, and focus on the task at hand). Therefore, the undersigned finds that the ALJ fairly and fully developed the record in this case.

Plaintiff also contends that the ALJ erred by not giving substantial weight to Dr. Shaw's opinion that Plaintiff was disabled in determining Plaintiff's RFC. Defendant, on the other hand, maintains that the ALJ gave Dr. Shaw's opinion appropriate weight because his opinion was not supported by the record. The undersigned agrees that the ALJ accorded proper weight to Dr. Shaw's assessment.

"A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight . . . provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted). However, "an ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." Holstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001) (citation omitted). In doing so, the ALJ must give good reasons. Id.

In the instant case, Dr. Shaw treated Plaintiff for alcohol related pancreatitis, not problems stemming from Plaintiff's hip or shoulder. Dr. Shaw did not perform any tests related to Plaintiff's

17

orthopedic impairments, and his assessment is void of any supporting medical evidence. Conversely, Dr. Maylack, Plaintiff's treating orthopedist, relied on x-rays and physical examinations to find that Plaintiff's condition was improving and advise Plaintiff to continue an exercise program. (Tr. 807-11) In his opinion, the ALJ explicitly stated that he gave greater weight to Dr. Maylack, as Plaintiff's treating physician with orthopedic expertise. (Tr. 25) The Defendant correctly states that "opinions of specialists on issues within their areas of expertise are 'generally' entitled to more weight than the opinions of non-specialists." Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005). Dr. Maylack's treatment notes and test results reflect improvement to Plaintiff's medical condition post hip and shoulder replacement surgery.

Further, unlike Dr. Shaw, who never conducted a physical evaluation of Plaintiff's hip and shoulder, Dr. Tippett conducted a full orthopaedic examination of Plaintiff. (Tr. 744-752) After the examination, Dr. Tippett completed a medical source statement indicating Plaintiff's exertional limitations. The ALJ properly relied on this assessment when determining Plaintiff's RFC. Dr. Shaw's medical source statement included conclusory statements regarding Plaintiff's disability with no supporting data. "An ALJ may discount a treating physician's medical opinion, and adopt the contrary medical opinion of a consulting physician, when the treating source's statements are conclusory, unsupported by medically acceptable clinical or diagnostic data, or when the ALJ's determination is justified by substantial evidence in the Record as a whole." Scott v. Astrue, No. 06-4032 (PAM/RLE), 2008 WL550119, at*22 (D. Minn. Jan. 7, 2008). Thus, substantial evidence supports the ALJ's determination that Dr. Shaw's opinion was not entitled to substantial weight. The Court will therefore affirm the Commissioner's decision that Plaintiff's disability ceased on February 15, 2004 and that his entitlement to disability benefits ended on April 15, 2004.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

                                                 /s/ Terry I. Adelman
                                      UNITED STATES MAGISTRATE JUDGE

Dated this  25th  day of March, 2009.